The State v. Dettmer.

THE STATE v. DETTMER, *Appellant.*

Division Two, November 5, 1894.

1. **Criminal Practice**: CONTINUANCE: GOOD FAITH OF APPLICANT. An application for a continuance must not only be formally sufficient but must be made in evident good faith, and whether it is so made is a matter which the trial court is better fitted to determine than the supreme court.

2. ———: ———: ———. The trial court's ruling on such question will not be disturbed on appeal, unless it is plainly made to appear that its judicial discretion was unsoundly or oppressively exercised.

3. ———: ———: COUNTER AFFIDAVITS. The state may file counter affidavits on defendant's application for continuance.

4. ———: MURDER: PRIOR AFFRAY: EVIDENCE. On the trial of one indicted for murder, evidence of a prior affray between the same parties, or between one of them and a third person, is admissible where its tendency is to throw light on, or explain, the transaction in question.

5. **Criminal Law**: HOMICIDE: SELF-DEFENSE. The right of self-defense can not be invoked unless all other means of self-protection failed; the person assailed must retreat if retreat be practicable.

6. **Criminal Practice**: EVIDENCE: PHYSICAL FACTS. Where the testimony of a witness is contrary to the immutable physical facts of the case, neither the court nor jury is required to believe it.

7. ———: MURDER: MALICE: FRESH PROVOCATION. Where malice was harbored by the accused against the deceased and a fresh provocation was received by the former, such provocation is to be disregarded, unless it is shown that the murderous purpose was abandoned before the homicidal act was committed; the presumption in such case being that the killing was induced by the malice, and not by the passion, produced by the provocation.

*Appeal from Andrew Circuit Court.*—HON. WILLIAM S. HERNDON, Judge.

AFFIRMED.

Murder in the first degree was the accusation against defendant, and on that he was found guilty of the second degree of that crime, and his punishment fixed at ten years in the penitentiary, and he appeals to this court.

The homicide of which defendant was convicted occurred at Dick Porter's saloon in the city of St. Joseph on the night of February 27, 1892. From a mass of irrelevant testimony these facts in regard to the killing are obtained: Two weeks before the homicide the defendant, William Dettmer, and Frank Breeze, the deceased, had a difficulty in which the defendant was worsted; no weapons were used by either party. As the defendant left the room he remarked, in the hearing of those who accompanied him to the door, "I will get that s— of a b—— before a week;" similar threats were made by defendant to others down to a short time before Breeze was killed. On the night of the killing, the deceased was in the saloon with a number of others, and was about to engage in a game of pool, and had just commenced the game, when the defendant came in. While the deceased was standing at the pool table the defendant began to abuse him with foul epithets, keeping, at the same time, his hand on his pistol in his pocket, when the deceased said in reply that he wanted nothing to do with defendant and for him to go away, but if the defendant would go out into the yard he would whip him. The defendant continued his abuse, when the deceased again told him to go away, that he did not want to have any trouble with him; at which time the barkeeper began to remonstrate with the de-

fendant and insisted on his keeping quiet; just at this juncture the defendant drew a revolver and fired at Breeze, who was standing near the pool table; the latter, apprehending that the defendant was about to shoot at him, dodged or attempted to dodge down behind the pool table, and the first shot fired by the defendant missed him, and the ball entered the wall of the room behind where the parties were standing. Immediately after the first shot was fired the deceased straighted up, wheeled half round, facing toward the door and from the defendant, and fled from him. The defendant then fired the second shot while Breeze was running away from him, and with his back turned, which struck the deceased between the middle lobe of the left ear and the base of the skull, and ranged upward and inward toward the frontal bone, lodging near the right eye. From the effect of this wound the deceased died almost instantly.

The testimony on behalf of the defendant was to the effect that Breeze began the difficulty by using profane and obscene, abusive words to defendant, at the same time having a cue and a billiard ball in his hand, when defendant said: "Breeze, you beat me up once, give me the worst of it; I am not looking for the worst of it again;" that Breeze continued his abuse, when the bartender came out and asked defendant to keep quiet, and defendant told him he would, etc.; that Breeze renewed the trouble and abuse, told defendant he had whipped him once and could do it again, and drew back the billiard ball as if to throw it at defendant, saying, "I will get you now," when defendant fired his pistol off *"just to scare him,"* when he dodged down behind the pool table, and raised up again as if in the act of throwing, when defendant fired again, but *"not with the intention of hitting him;"* that when the second shot was fired, though Breeze was looking

at defendant when Breeze came up from behind the table, yet he turned *his face away from defendant*, turned his head around from him in order *to throw the ball at him*. There was other testimony corroborating to a considerable extent that of defendant. One of the witnesses in describing the attitude of breeze when shot, saying: "He was *facing* to Dettmer, *looking over his left shoulder*, with his body to the wall."

There was also testimony that Breeze bore the reputation of being a quarrelsome, turbulent man, and there was testimony of a contrary effect. And there was testimony that the reputation of defendant as having a quiet and peaceable disposition was good.

After committing the crime defendant fled, and was subsequently captured in Tennessee, where he was living under an assumed name.

At the November term, 1893, of the Andrew circuit court, to which the venue had been changed, defendant filed his second application for a continuance on account of absent witnesses, which application was denied.

*Thomas F. Ryan* and *James W. Boyd* for appellant.

(1) *First.* The court erred in overruling defendant's application for a continuance. The application complied with every requirement of the statute. R. S., sec. 4181. *Second.* The court erred in permitting the state, over the objection of the defendant, to introduce counter affidavits to rebut the showing made in defendant's application for a continuance. There is no law or authorities that justify the court in allowing the consideration of such affidavits. If the defendant's application made a proper showing for a continuance, then the court should have granted it, and ought not

to have considered the counter affidavits. Besides, it had the effect of prejudicing the minds of the panel of jurors against the defendant to have the affidavits read in their presence, which was done in this case. We submitted this as clearly error upon the part of the court. (2) The court erred in permitting the state to introduce evidence of a former difficulty which the defendant had with another person that occurred two weeks prior to the fatal difficulty with the deceased. The effect of the evidence was to present to the jury testimony relating to another assault and to an entirely different transaction, which prejudiced the minds of the jury against the defendant in reference to the charge for which he was on trial. *People v. Gibbs*, 93 N. Y. 471; *State v. Clayton*, 100 Mo. 520; *State v. Reavis*, 71 Mo. 419; Wharton's Criminal Evidence [9 Ed.], secs. 30 to 50; 2 Bishop's Criminal Procedure, secs. 1121, 1124. (3) The court erred in refusing to instruct the jury as to manslaughter in the fourth degree, as asked for in the defendant's first instruction. The evidence on the part of the defendant shows that the deceased provoked the difficulty by using indecent and opprobrious epithets towards the defendant, and was in the act of assaulting the defendant with a billiard ball when the defendant fired the fatal shot, and that when the defendant killed the deceased he did so while in a heat of passion and aroused by the epithets used towards him and the assault made upon him by the deceased. The killing under such circumstances is not murder, but if not justifiable homicide, is only manslaughter in the fourth degree. *State v. Stiltz*, 97 Mo. 20; *State v. Elliott*, 98 Mo. 150; *State v. McKinzie*, 102 Mo. 620; *State v. Douglas*, 81 Mo. 231; *State v. Berkley,*, 92 Mo. 41; *State v. Berkley*, 109 Mo. 665; *State v. Crabtree*, 111 Mo. 136.

The State v. Dettmer.

*R. F. Walker*, Attorney General, and *R. E. Culver*, Prosecuting Attorney, for the state.

(1) There was no error in overruling the application for continuance. *State v. Murphy*, 118 Mo. 7; *State v. Banks*, 118 Mo. 117. (2) The filing by the state of counter affidavits to defendant's application for a continuance was proper. *State v. McCoy*, 111 Mo. 517; *State v. Bailey*, 94 Mo. 311. (3) Under the particular circumstances in this case, it was not error to admit evidence of a former difficulty between deceased and defendant, for the purpose of showing the malice which actuated the latter on firing the fatal shot. *State v. Williamson*, 106 Mo. 162; *State v. Senn*, 11 S. E. Rep. (S. C.) 292; *White v. State*, 20 Tex. App. 652; *People v. Thompson*, 92 Cal. 506; *Billings v. State*, 12 S. W. Rep. (Ark.) 574; *State v. Schleagel*, 50 Kan. 325. (4) The failure to require the sheriff to be sworn before taking charge of the jury, as directed by section 4210, Revised Statutes, 1889, does not constitute reversible error, unless it is shown that defendant suffered prejudice thereby. *State v. Frier*, 118 Mo. 648. (5) No objections were made and exceptions saved at the time to the remarks alleged to have been made by the prosecuting attorney in his argument to the jury, and they will not be considered by this court. *State v. Welsor*, 117 Mo. 570; *State v. Foster*, 115 Mo. 451; *State v. Bulling*, 105 Mo. 204; *State v. Musick*, 101 Mo. 260; *State v. Elvins*, 101 Mo. 243; *State v. DeMosse*, 98 Mo. 340. (6) Evidence of statements made by defendant at a former trial are admissible. *State v. Rose*, 92 Mo. 207; *State v. Jefferson*, 77 Mo. 136; *State v. Eddings*, 71 Mo. 548.

SHERWOOD, J.—I. There was no error in denying defendant's application for a continuance, and this is

true for several reasons:   Both of the absent witnesses are permanent residents of Buchanan county, and were there a few days before the trial.   The day before the trial, a brother of the deceased saw and talked to both of the witnesses, one in Savannah, Andrew county, where the cause was pending, and the other in St. Joseph.   The record shows that a similar application on account of the absence of one of these witnesses had been granted by the court on a former occasion.   The affidavit for the continuance states that affiant knows of no other witnesses by whom the same facts can be proved as by the absent witnesses and yet the record shows that there were several such witnesses who testified to the same facts at the trial.

An application for a continuance must not only be *formally sufficient*, but one of its essential elements, its prominent feature, must be an *evident good faith*.   It must not be a mere *dodge-trial-paper*.   Whether good faith prompts the application, the trial court is obviously the better fitted, more accurately, to judge.   For this reason it is that it has become the uniform rule of this court to defer to the trial court in such matters, and not to reverse its action, unless the party assailing that action makes it plainly to appear that the judicial discretion in that regard has been unsoundly or oppressively exercised.   *State v. Banks*, 118 Mo. 117, and cases cited.

No such abuse of discretion is apparent here. Besides, there were counter affidavits filed herein by the state, and that this is the proper practice has been the settled law in this state since the early case of *Riggs v. Fenton*, 3 Mo. 28; *State v. Bailey*, 94 Mo. 311; *State v. McCoy*, 111 Mo. 517.

II.  There was no impropriety in admitting evidence of defendant's having knocked down an old drunken Irishman, because this was the beginning of the hostil-

ity between Breeze and defendant, as Breeze took the old man's part, remonstrated with defendant about his unmanly conduct, which remarks led to the quarrel and fight between Breeze and defendant, resulting in the latter "getting the worst of it," and immediately afterwards making threats against Breeze which were continued from time to time and to different persons, almost down to the time those threats found bloody consummation in the crime which constitutes the basis of the present prosecution. It was necessary, therefore, to show the relations between the parties, the genesis of their trouble, the cause of the malice borne by defendant towards Breeze, how it had its origin; and in order to show these things, in order to understand all about the case *ab oro*, it became necessary to show just how the difficulty originated, and this could only be satisfactorily done by showing that the trouble began over the attack made by defendant on the old Irishman. Otherwise Breeze would have been made to appear as the party in fault at the very inception of bad feeling between the parties.

And if error had been committed in the reception of the testimony mentioned, that error was cured by the introduction of testimony of a similar kind to that in regard to the old Irishman, when defendant came on the stand to testify; at which time defendant testified that Breeze was in fault and the aggressor in the first quarrel, and gave him a very severe beating, the effects of which, defendant stated, he still felt.

The rule is universal in its acceptation, that evidence of other crimes, of other fights between the same parties, or between one of them and some stranger, may be received wherever and whenever such testimony, otherwise inadmissible, has any tendency to elucidate any pending investigation or to discover the

hidden springs which prompted any litigated step or action.

III. The instructions which were given by the court were *twenty* in number, and embraced all grades of homicide except manslaughter in the first and second degrees, and on other points the instructions were such as have often been approved by this court.

But it is urged that an instruction asked by defendant on the subject of manslaughter in the fourth degree should have been given. When this record is carefully read, however, it is difficult to resist the impression that neither instructions on manslaughter in any of its degrees, nor on the subject of self-defense should have been given. Not on the subject of self-defense, because the right of that nature is not to be invoked unless all other means fail; it is the *dernier ressort*, and in order to justify a homicide on the ground of self-defense, the doer of the homicidal act must have done everything in his power, consistent with his safety, to avoid the danger and to avert the necessity; and he must retreat, if retreat be practicable. Kerr's Law of Hom., sec. 180, p. 203 and cases cited; *State v. Tabor*, 95 Mo. 585; *State v. Gilmore*, 95 Mo. 554. This rule is applicable to the facts of this case, although it has its well ascertained exceptions.

Here defendant made no attempt to avoid the dire necessity of firing the fatal shot; he did not retreat nor even attempt to do so; he simply stood his ground, and not satisfied with firing one shot at his adversary, causing him to dodge down behind the table to avoid his murderous aim, he continued to fire after his enemy's back was turned and when he was fleeing from him. There is abundant testimony to this effect; it is true there is some to the contrary, but the former testimony is supported by the *physical facts* in the case, to wit: That Breeze is found dead with a

bullet which entered the *back of his head* and ranged forward over his right eye, and by the further physical fact that no man was ever known to attempt to throw at another *by looking at him over his left shoulder, or by turning away his head from him at the very instant he was attempting to throw at him!*

When witnesses attempt to establish a certain theory by their testimony, they must first look to it well that their testimony must not go counter to the physical facts in the case; for, if it does, neither courts nor juries are required to stultify themselves by disbelieving the immutable physical facts in the case, and so we have said on a number of occasions. *State v. Anderson*, 89 Mo. 332; *State v. Bryant*, 102 Mo. 24; *State v. Turlington*, 102 Mo. 642; *State v. Nelson*, 118 Mo. 124; *State v. Nocton*, 121 Mo. 537.

Now, regarding an instruction as to manslaughter in any degree: There is the testimony of at least three witnesses that defendant on the night of the first difficulty and two weeks before the last one, made ominous threats of revenge against Breeze, repeated at least twice afterwards and down almost to the night of the homicide; that on that night and just a short time before the homicide, Berry asked defendant to lend him his pistol, but defendant told him *"he might want to use it"* himself. On that night, too, while in Porter's saloon, he kept his hand in his pocket where he had his pistol, and presumably on that weapon. So that the testimony lays a broad basis for the existence of *preconceived malice* on defendant's part, aside from the fact of the use of a lethal weapon; and where malice is shown to have been harbored, and a fresh provocation arises to the party cherishing the malice, the provocation is to be disregarded, unless the murderous purpose can be shown to have been abandoned before the act was done; because, where provocation intervenes

between expression of malice and killing, the presumption is that the killing was upon the malice, and not upon the passion produced by the provocation. Kerr's Law of Hom., sec., 97, p. 91, and cases cited.

For these reasons, no error occurred in refusing to give defendant's instruction as to manslaughter in the fourth degree, nor would error have been committed had instructions as to all degrees of manslaughter been refused, as well as instructions on the theory of self-defense.

These views result in an affirmance of the judgment. All concur.